# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 03-898


### JAY ANTHONY DUHON, ET AL.


### VERSUS


### DEAN PETER DUHON, ET AL.


**\*\*\*\*\*\*\*\*\*\***
APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 98-1104
HONORABLE JULES D. EDWARDS, III, PRESIDING
**\*\*\*\*\*\*\*\*\*\***


## SYLVIA R. COOKS
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Sylvia R. Cooks, Oswald A. Decuir and Glenn B. Gremillion, Judges.

**AFFIRMED.**

**Robert H. Matthews**
**830 Union St., 4th Floor**
**New Orleans, LA 70112**
**(504) 523-4542**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
     **Jay Anthony Duhon, et al.**

**Edward P. Landry**
**Landry, Watkins, Repaske & Breaux**
**211 E. Main Street**
**P.O. Drawer 12040**
**New Iberia, LA 70562-2040**
**(337) 364-7626**
**COUNSEL FOR APPELLEE:**
     **Oats & Hudson, Attorneys and Counselors at Law**

**COOKS, Judge.**

David, Jay, and Dean Duhon are brothers who became business partners in a residential and golf club development project in Carencro, Louisiana. The project was to be constructed partially on family owned land and partially on land of an adjacent owner, Phylip Domingue. The brothers were to own the business venture one-third each, and to share profits from the sale of residential properties and the operation of the golf course equally.

From its inception, there were numerous problems. While the golf course became operational, it was short-lived and the business venture between the brothers fell apart. In an attempt to dissolve the project and settle the differences between the brothers, a meeting was hastily arranged at the law offices of Oats & Hudson on the evening of February 24, 1997. At the beginning of the meeting, Stephen Oats informed the brothers he could not represent any of them individually with regard to the dispute. The meeting continued into the early morning hours of February 25, 1997, when there was a tentative agreement reached between the brothers. However, according to Dean Duhon, he informed his brothers he could not finalize any agreement without first discussing the matter with his wife, who was not present at the meeting. The tentative agreement was never reduced to writing. Dean Duhon described the meeting in his testimony as follows:

> I know that Steve (Oats) had walked around with a pad, just kind of getting everyone's complaints and what people wanted – what the three (3) of us wanted to see happen with the situation. And it – There was pretty much a general outline of where we were going to go, what we had all decided would be feasible if it worked out. And he kind of let us – The meeting kind of ended with, you know, "Okay. So far these are the guidelines we have. Let's see if these are accomplishable."

> . . . some of the things that we were trying to accomplish was that my two (2) brothers would end up with the majority of the property or everything in a line that the golf course was sitting on, the operational part of the golf course. And I was to receive the seven (7) lots that are

along Trappey Road as a builder. And we were trying to separate the properties. Generally speaking, that's pretty much what was going to happen, "You take the property with the golf course, and I take my side."

According to Dean, when he discussed the proposal with his wife the next morning, she informed him they were too heavily mortgaged for the proposal to be feasible for them. Dean then informed his brothers that his wife was not interested in the proposal submitted at the meeting; thus, they would not agree to the proposal.

As a result of Dean's refusal to enter into the proposed agreement, a lawsuit was brought by David Duhon, Jay Duhon, and Marlissa Duhon (Jay's wife) against Dean Duhon, Mary Louise Holden Duhon (Dean's wife), the Oats & Hudson law firm and MidSouth National Bank (a party involved in the financing of the project). Prior to trial, plaintiffs settled their claims with MidSouth and it was dismissed from the lawsuit.

Oats & Hudson filed an Exception of Prescription based on the accrual of the peremptive period of La.R.S. 9:5605 as to any and all alleged acts of negligence. Oats & Hudson also filed an exception of no cause of action. After a hearing on the exceptions, the trial court granted the exception of prescription as to the alleged acts of negligence prior to the meeting of February 24-25, 1997, but denied the exception as to any acts of negligence which allegedly occurred at the time of the meeting. The court also denied the exception of no cause of action.

The case proceeded to trial. Because of the earlier ruling on the exceptions, the trial court excluded evidence of all of Oats & Hudson's alleged acts of negligence prior to the February, 1997 meeting. When it became apparent that the claims against Dean and Mary Duhon could not proceed in tandem with the claims against Oats & Hudson before the same jury, plaintiffs elected to dismiss their claims against the

Duhons and proceed against Oats & Hudson. After the close of plaintiffs' case in chief, Oats & Hudson filed a motion for directed verdict alleging that the agreement in dispute was a "tentative, conditional agreement." The trial court granted the motion. Following instructions from the court, the jury returned a verdict finding Oats & Hudson did not deviate from the standard of care at the meeting.

Plaintiffs filed a motion for new trial on two grounds: first, that the trial court's exclusion of evidence regarding claims of negligence was based on an unconstitutional statute (La.R.S. 9:5605) and prevented them from presenting evidence critical to their legal malpractice claim; and second, that the uncontradicted evidence relating to an attorney's standard of care coupled with the trial court's directed verdict on the existence of a tentative, conditional agreement mandated a finding that the defendant deviated from the standard of care in not reducing the agreement to writing.

The trial court denied the motion for new trial on both grounds, giving the following reasons:

> It seems to me that there was sufficient evidence presented during the course of this trial for this jury to come out with this result. On the other hand, had the case been tried to me under the evidence presented, I would have found that there was a duty to write down, to document this tentative, conditional agreement, or explain why it was too nebulous to document where the terms and conditions were too incoherent to accurately document at that time.
>
> But I don't think that there is – that there was insufficient evidence for the jury to come to the conclusion that it came to.

The trial court also refused to declare La.R.S. 9:5605 unconstitutional, noting plaintiffs failed to raise the constitutionality issue pre-trial.

Plaintiffs appealed the trial court's judgment, asserting the following assignments of error:

1.  The trial court erred in partially granting defendant's Exception of Prescription because La.R.S. 9:5605 is unconstitutional.

2.  The trial court erred in excluding evidence critical to plaintiffs' legal malpractice claim based on La.R.S. 9:5605 because that statute is unconstitutional.

3.  The jury's finding exculpating the defendant from fault was clearly contrary to the law and the evidence.

4.  The trial court erred in denying plaintiffs' motion for new trial because the verdict and judgment were clearly contrary to the law and evidence.

**ANALYSIS**

In its first two assignments of error, plaintiffs attack the constitutionality of La.R.S. 9:5605. The effect of La.R.S. 9:5605 on this case, according to plaintiffs, is that its application prevented the jury from hearing the evidence that Oats had been involved in representing the family in developing the project from the beginning. Instead, the jury was told that Oats was merely a "good Samaritan" attorney who at the last minute interjected himself into a family dispute to help out.[1] The partial granting of defendant's Exception of Prescription limited the jury to evidence of the February 24-25 meeting.

Plaintiffs argue La.R.S. 9:5605 is unconstitutional under Louisiana Constitution Article 2 and Article 5 because it subverts the Louisiana Supreme Court's authority to regulate all facets of the practice of law and under Article 1, Sections 2 and 3 because it denies plaintiff equal protection and due process of laws. Plaintiffs also contend the statute is violative of the Fourteenth Amendment of the United States

---

[1] We do note that after reviewing the record there were numerous references made in the testimony to Oats' past involvement in the project. In our view, plaintiffs' contention that the jury was fooled into believing Oats became involved at the last minute to help the family is not supported by the record.

Constitution. Although we find plaintiffs' constitutional objections present interesting questions, we need not address them to resolve the present case.

Although plaintiffs theorize the jury would have reached a different result had it been informed of Oats' prior involvement with the project, we find this argument speculative at best. Plaintiffs' legal malpractice case was premised on Oats' failure to document the tentative agreement reached at the meeting on February 24-25, 1997; however, this failure did not automatically require the jury to find Oats committed legal malpractice.

Plaintiffs do not seriously dispute that the tentative agreement reached in the early morning hours of February 25, 1997, could not have been signed that evening (even if reduced to writing) because indispensable parties were not present. Essentially, what plaintiffs are arguing is that Oats breached the standard of care by simply failing to document the tentative agreement in writing or in refusing to explain why the tentative agreement should/could not be reduced to writing.

Plaintiffs relied on the testimony of their expert, Bernard H. McLaughlin, Jr., to support their position that Oats deviated from the standard of care and breached the rules of professional conduct. McLaughlin stated that he believed a written settlement agreement should have been signed at the culmination of the February, 1997 meeting. McLaughlin noted that in "[a]lmost all the mediations I do the [parties'] lawyers are present. . ." None of the parties were represented by legal counsel at this meeting, and Oats informed all the parties present at the beginning of the meeting that he could not represent them in any further legal actions. In his testimony, McLaughlin repeatedly referred to the provisions of the Louisiana Mediation Act in reaching his conclusion that Oats deviated from the standard of care. As Oats & Hudson notes, this section

of the Louisiana statutes did not become effective until January 1, 1998, which was after the meeting in question.

Further, it is certainly reasonable that the jury may have found the February 24-25 meeting was far too spontaneous and chaotic to amount to a mediation. The meeting was not set up until the afternoon of February 24, 1997, when Jay Duhon spoke with Oats' secretary to see if a meeting could be arranged. As stated earlier, there were no lawyers representing any of the parties. The meeting took place after hours, and there were no secretaries or assistants present. Two indispensable parties to the proceedings were not present, Mary Duhon and Marlissa Duhon.[2] On cross-examination, McLaughlin admitted when parties to a mediation make it clear they will not sign an agreement without discussing it with other parties, there is no need to write up the agreement:

> Q: We have one party – Look at it from a hypothetical sense. You have a mediation, if you want to call it a mediation. You've got one party that says and is telling us in this case, "I wasn't signing anything." You've got another party that wasn't present who later says, "I'm not doing the deal." And you've got the other two (2) – one of them which is agreeing that those arrangements were something that needed to be – those conditions needed to be completed before we had a deal. And then they find out soon after that that it didn't work.

> A: In that effect – I understand what you're getting at. To that effect, if the conditions couldn't be met, then, yeah, you don't have a deal, but I don't know if that relieves somebody's underlying obligation to at least set it up to see if you could have arrived at a deal. And here there was no written agreement ever done.

> Q: Oh, no, I understand that. But when you get to the end of a mediation that can't be completed or somebody says, "You know, Mr. McLaughlin, I'm not going to sign that agreement tonight. I'm not agreeing to it. I'm not signing anything until I go talk to somebody else."

---

[2] Marlissa Duhon was present at the beginning of the meeting, but stayed only for a short time and was not present when the tentative agreement was reached.

A: That occasionally happens.

Q: And if that happened in this case, well, then no harm, no foul, you just had somebody –

A: If that happened in this case, then, there would be no need to write up that agreement.

Jay Duhon, when confronted with his earlier deposition testimony, begrudgingly admitted that he was aware that Dean required the approval of his wife before he could sign off on the tentative agreement.

David Duhon testified he referred to the February 24-25, 1997 encounter at the Oats & Hudson law offices as a meeting rather than an arbitration or mediation. He acknowledged that Oats had "no authority to make me sign" any agreement or to "force" the parties to do anything that night.

Dean Duhon testified he did not know the purpose of the meeting. When questioned as to why his wife was not present at the meeting, Dean stated he felt they were on the same page and he "can represent her and let her know what this meeting is about. And, you know, if she's got some input when it's over with, I'll relay it and just kind of let you know what's happening." Dean also stated he was unaware that any agreement was to be signed that night. When asked if he was satisfied with the tentative agreement reached, Dean stated "[n]o, but I could see at 1:30 in the morning we wasn't going to go much further."

The standard for determining whether an attorney has been guilty of negligence or professional impropriety was set out in *Ramp v. St. Paul Fire & Marine Ins. Co.*, 263 La. 774, 269 So.2d 239 (1972):

> An attorney is obligated to exercise at least that degree of care, skill, and diligence which is exercised by prudent practicing attorneys in his locality. He is not required to exercise perfect judgment in every circumstance.

The test is whether Oats' actions or inactions fell below the applicable standard of care for attorneys in his locality. At trial, even plaintiffs' expert could not unequivocally testify that Oats' alleged failure fell below the applicable standard of care. Further, an attorney can only be liable to his client for damages caused by the attorney's negligence in handling the client's business, if the client proves by a preponderance of the evidence that such negligence is the proximate cause of the loss claimed. *Toomer v. Breaux*, 146 So.2d 723 (La.App. 3 Cir.1962); *Arrington v. Law Firm of Aucoin & Courcelle, L.L.C.*, 02-642 (La.App. 5 Cir. 10/16/02), 832 So.2d 319; *Bauer v. Dyer*, 00-1778 (La.App. 5 Cir. 2/28/01), 782 So.2d 1133, *writ denied*, 01-0822 (La. 5/25/01), 793 So.2d 162. The record in no way supports the allegation that Oats' failure to document the tentative agreement was a legal cause of plaintiffs' loss. Dean Duhon testified he would not have signed any agreement that night without first checking with his wife, who was a co-owner with him in the business venture. His wife, when informed of the substance of the tentative agreement, was adamant that it would not be acceptable to her and Dean.

Where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. *Stobart v. State Through Dept. of Transp. and Development*, 617 So.2d 880 (La.1993). The issue which the reviewing court must resolve is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. *Id.* Even if the appellate court would have decided differently had it been the original trier of fact, the trial court's judgment should be affirmed unless it is clearly wrong or manifestly erroneous. *Id.* Therefore, we will not disturb the jury's verdict, nor will we overturn the trial court's denial of the motion for new trial.

**DECREE**

For the foregoing reasons, the judgment appealed from is affirmed. Costs of

this appeal are assessed to plaintiffs-appellants.

**AFFIRMED.**